# ENRIQUE PONSA PARÉS

*v.*

# J. REYNES & COMPANY.

---

San Juan, Equity, No. 334.

1. Failure of a party to produce proof in its control produces a presumption against it.

2. A possessory title which does not antedate the attachment under which the property was sold is not prior to the conveyance to the purchaser in attachment.

Parés v. J. Reynes & Co.

3. The court will not presume that a landowner was cited in proceedings for a possessory title when all the facts in the case rebut such a presumption.

4. A party with a better title under an unregistered conveyance is not barred by a possessory title in less than twenty years.

5. Fraud in the procuring of a possessory title is sufficient, of itself, to confer jurisdiction upon a court of equity.

6. Parties are estopped from denying their former acts and declarations.

7. Uncertainty as to the effect of a remedy at law, and the certainty of a multiplicity of suits, are grounds for the exercise of equitable jurisdiction.

8. An action to annul a possessory title for fraud, to correct or cancel the entries on the books of the registrar of property, to recover the land, and for an accounting, is not multifarious, and may be brought on the equity side of the docket.

9. Subsequent purchasers claiming under one who obtained a possessory title by fraud are bound by his acts.

10. Purchasers having prior actual notice of facts adverse to the title of their grantor are not innocent purchasers without notice.

11. A fraudulent possessory title and the conveyances thereunder are clouds upon the title, and will be removed by an order directed to the registrar of property.

12. Under the law "in force in Porto Rico, a possessory title, before the time has elapsed to entitle its possessor to a dominion title (and before that is done) has no final effect as to a better title, either in favor of the person to whom it is issued or his assigns, and is simply notice to the world that the person in whose favor it is issued is holding adverse possession of the premises."

13. Such a title has no effect as against a person who should have been cited, but who was not.

Opinion filed March 8, 1907.

*Messrs. Hartzell & Rodriguez* and *Rafael Guillermety, Esq.,* solicitors for plaintiff.

Note.—Presumption against a party from failure to produce evidence, see note to Cartier v. Troy Lumber Co. 14 L.R.A. 470.

*Cay. Coll y Cuchi, Esq.,* and *Felipe Cuchi, Esq.,* solicitors
for defendant.

RODEY, Judge, delivered the following opinion:

The complainant is a subject of the King of Spain, but re-
sides in Porto ·Rico; the respondent is a copartnership composed
of J. Reynes and Antonio Marquez, both also subjects of the
King of Spain, the former of the partners residing in Porto
Rico and the latter in Spain. The concern does business in the
island of Porto Rico, the said J. Reynes being the managing
partner thereof. This partnership, it is alleged, with full
knowledge of complainant's rights, bought the 20 cuerdas of
land about which this litigation is pending, from one Gregorio
Duran, by a deed dated May 8, 1897, which deed, although
conveying some 220 cuerdas of land, is alleged to include the
particular piece of land in controversy.

The bill alleges that the complainant is the owner of this
tract of land, and that it is situated in the barrio of Fronton,
municipal jurisdiction of Ciales, in Porto Rico, and sets out
complainant's alleged title to the same, and alleges that re-
spondents and their grantor had full knowledge of such title,
and that, notwithstanding this knowledge, one Gregorio Duran,
respondents' grantor, falsely and fraudulently obtained an ex-
pediente posesorio or possessory title to the same at a time when
complainant was absent and had no notice or knowledge of
the proceedings to obtain the same, etc., and further alleges that
it was, as aforesaid, among other properties, conveyed to the re-
spondent copartnership by the said Duran. It prays that the
complainant be declared to be the owner of the land in contro-
versy and that the deed to the respondent partnership be can-
celed as a cloud upon such title, and also that said proceedings

Parés v. J. Reynes & Co.

heretofore taken by the said Duran, by which he obtained an expediente posesorio with reference to the same, and the registry thereof, also be canceled and held for naught, and that the proper registrar of property be ordered to make all proper entries to accomplish these objects and vest complainant with his unencumbered fee to the same. The bill also prays that an accounting be had of the profits realized from said land and its cultivation since the date of the alleged deed to respondents, and that they be compelled to pay the same to complainant.

The respondents demurred to the bill on the ground that the complainant has a complete and adequate remedy at law, and have never ceased at any stage of the proceeding to urge this objection to the jurisdiction. A former judge, after a full hearing, overruled the demurrer, and, thereafter respondents filed their answer without oath, the same having been waived, and denied practically every material allegation of the bill. Complainant then filed a general replication, and the matter remained in this condition for some months until the present incumbent of this bench qualified.

Immediately on the cause coming on for trial, respondents again urgently pressed the points made in their demurrer, but the court refused to disturb the issue as theretofore joined, but reserved to itself the right to consider the points made in the demurrer at the conclusion of the entire case. Thereupon the trial proceeded, both parties introduced their oral and written evidence and thereafter filed their respective briefs, respondents still pressing and urging their demurrer. The stenographer thereafter transcribed his notes of the evidence and the cause is now before the court for final decision on the whole record, the evidence, and the exhibits.

The controversy cannot very well be understood without the following

## Statement and Argument.

It appears that in about the year 1856, a man by the name of Santiago Fontanes lived in this barrio of Fronton in the island of Porto Rico, and that under a proceeding of law then in force authorizing the same, the Spanish government conceded to him some sort of a preliminary or protective right in the possession of a tract of land said to contain within its boundary points some 200 cuerdas. This grantee continued in possession of, and to live upon, this tract of land during the remainder of his life and raised a family thereon, the latter continuing to live upon the same. In 1891, at which time, it appears, under an existing statute of limitations, they were entitled thereto, these heirs or succession made proper application to the then Spanish authorities of the island for the confirmation in fee of this title made to their said ancestor, which was granted, but it is not very clear from the proofs and documents whether the confirmation of the 200 cuerdas which the original possessory grant was said to contain was made to the heirs or succession as a whole, or to Martin Fontanes, who was one of them, and his heirs. The weight of the evidence, however (see complainant's exhibit C) indicates that the land was confirmed to Martin Fontanes, as he and his family were then living upon it. Counsel for complainant insists that the land was thus confirmed to Martin Fontanes alone, and that therefore his sisters, Francisca and Bartola, never had any title to any of the land, and that if they had made a deed to Duran, as hereafter mentioned, it would not have availed.

Parés v. J. Reynes & Co.

However, in 1891, at the time when the government surveyor came upon the ground to demark the land, a fact which had long been suspected was ascertained to be true,—that within the original concession there was a considerable surplus of land. In this survey, the quantity of this surplus was ascertained to be 57 cuerdas, so that the tract, as finally demarked, contained 257 cuerdas. Under the law it was necessary to do so, and the heirs of said Martin Fontanes made proper application to purchase this surplus, which was approved and the same was duly granted to them, but the deed therefor does not appear to have been issued to them until some six years later, on March 31, 1897, a little more than a month previous to the time the deed by the said Duran was made to the respondent copartnership.

The court saw the complainant, Enrique Ponsa Parés, and states that he is an elderly man of quite unusual intelligence, having been a merchant and planter all his life, and is apparently quite well educated in Spanish. Also having seen and heard them testify, the court can say that nearly all of these Fontanes heirs appear to be illiterate and rather ignorant, though apparently honest people.

It appears from the evidence that for many years the complainant, Enrique Ponsa Parés, although not always living in exactly the same locality with them, had been a sort of adviser and general factotum for this Fontanes family, and was called in whenever they had anything to do requiring advice, such as the making of surveys, deeds, etc. In fact, he was present when this confirmation of the original grant of land was made, in 1891, and when the Spanish government surveyor came upon the ground to demark the land, he went with the surveyor all around the property, and saw the different monuments, corners, and boundaries established. It appears also

that it was complainant who, at the request of these Fontanes heirs, then made the written application to the authorities for the right to purchase this surplus of land which was found to exist. It can thus be seen that complainant for many years had probably known more about the important portions of the business of these somewhat ignorant Fontanes heirs then they themselves knew.

The date is not certain, but it must have been some time in 1892, that these Fontanes heirs, who were all of age, with their husbands and wives, are said to have joined in a deed for the 20 cuerdas in controversy, which were carved out of the estate, to a man named Bernardino Negron, who was their brother-in-law, being married to one of the Fontanes women. It is in evidence in all its details that this man Negron paid $900 for this land, and by consent of the heirs paid most of it to one Carlos Ereño, one of their creditors, and that the land was measured off, staked off, and demarked to him, and he put in possession of it, and that he remained in possession of it thereafter, planting and working and perhaps living upon the place, though this latter fact is not clear, for a term of from six to eighteen months, as testified to by different witnesses, several of the witnesses saying they knew the land well, and its boundaries, as measured and marked by trees, etc., one of them saying he could find it with his eyes shut, he knew it so well. It is also in evidence that the complainant, Enrique Ponsa Parés, as usual, was called into the family council at the time the deed for this land was made, and that he, in fact, drew the instrument for them, it being what is called a private document, and signed it for several of the heirs at their request, they not knowing how to write. That after the deed was made, complainant and several

Parés v. J. Reynes. & Co.

of the heirs went upon and measured the land and marked it, as stated, and put Negron in possession of it. Complainant himself, as well as Negron, testified to this in detail, and also Carmelo Fontanes and Manuel Colon, the latter married to one of the Fontanes women, testified to having been present when the deed was made and the land delivered. And that all of the Fontanes heirs were then and there present and either signed or authorized the signing of the deed. Negron testified that he took possession of the deed which was given him, and kept it in a box at his house, and paid little or no attention to it thereafter, but that diligent search, which he made during this trial, failed to locate it, and that it is his opinion that it was lost in the great hurricane of a few years ago, when his house was blown down and his few household things largely destroyed. It is also in evidence that Negron, at least, about up to the time of getting this land, was living on a smaller tract of 6 acres of land adjoining this big Fontanes estate. Also that one of the principal neighbors and adjoining landowners to this Fontanes family was the aforesaid Gregorio Duran. That about the time Negron is alleged to have bought these 20 cuerdas of land, or shortly thereafter, he was indebted to this man Duran, and the latter brought two suits against Negron and wife, which were consolidated and proceeded with as a single suit against them. That during the progress of this suit, a writ of attachment was issued against this 6-acre property owned by Negron, but as it was about to be levied, a settlement occurred between the parties, whereby Duran bought the 6 acres himself for 2,500 pesos, or something like that, taking out the amount that was due him and paying the balance, some 700 pesos, to Negron, the latter soon thereafter removing from that section to Manati, where he has since been living as a sort of

hired man, share worker, or peon of the said Duran. It also
appears in evidence that the costs and lawyer's fees due from
Negron in this suit or litigation were not settled, and Negron
was thereafter proceeded against by the lawyer for the same.
This supplemental or subsequent proceeding went to judgment
and execution, and it is in evidence that these 20 cuerdas of
land, which are the subject of this controversy, were levied upon
to satisfy the same. At the sale which took place, apparently
in due form of law, and all of which is set out in proper certifi-
cates here from the court where it occurred, this complainant,
Enrique Ponsa Parés, became the purchaser for something over
400 pesos; but when the costs of the proceeding and the getting
of the deed and possession were added, it amounted to some-
thing like 600 pesos that the land had cost him. It appears
from this court certificate that when complainant finally got
his deed under this purchase, he asked the court to put him in
possession of the property, and the judge, together with some
sort of an executive officer in the nature of a sheriff, went out
to the ground itself and spent about five hours there and put
complainant in possession (though this latter fact is denied by
Duran), going through all the civil law formalities of pulling
up grass, breaking branches, etc., according to the ancient civil
law ceremony of juridical possession. It appears also that at
this very time, this man Duran was on hand and protested
against complainant being put in possession, claiming the land
as his own, and, as he claims, producing some sort of deed un-
der which he claimed to own and possess it, but the judge in-
formed him that he, Duran, must become plaintiff in a suit for
that purpose, and refused to recognize his claims, and put com-
plainant in possession. This is all shown in great detail by

the certificate introduced in evidence here (complainant's exhibit B), and by complainant's own evidence.

It also appears from the evidence that the complainant, after being thus put in possession, did not remain in actual physical possession very long, but went away, as he claims he bought the tract as a speculation and did not intend to live on it, and has never been in physical possession of the same since that time, but considered himself as constructively in possession under the possession given him by the court, but that he protested to a member of the respondent copartnership as soon as he learned of this sale by Duran to respondents of the large tract, which, it is claimed, includes the land in controversy, to which we will refer hereafter.

It is also shown in these papers and certificates that one of the respondent copartnership, J. Reynes, was the person who appraised the land in controversy under a requirement of the local law, before it could be sold under the execution, at the time complainant bought it, and that he appraised it at 34 pesos per cuerda, the return stating that this made 680 pesos for the 20 cuerdas which it contained, and the said Reynes certifying over his own signature and under oath, that he had examined the land and so valued it, etc., etc. The appraisement is a very specific sort of instrument, and sets out that Reynes was sworn and warned of what he was doing, etc. Reynes, on the stand in this trial, testified, over complainant's objection, in contradiction of this former sworn statement of his, that he was called in from the street informally, and valued the land as stated in the return. That he supposed he was valuing the 6-acre tract before referred to, on which Negron had lived, which was the only land he ever knew Negron to possess, and that, in fact, he never went on the land at all at the time of this

appraisement, and believed it was the same land he had seen Negron in possession of, and for that reason put this value upon it. That he never heard of the land in controversy, save in this suit, and does not know it and cannot identify it.

It also appeared in evidence that this man Duran purchased several pieces of this Fontanes estate from the heirs in about the years 1891 and 1892, and that in about the year 1893, before this complainant had purchased the tract in controversy at the execution sale as aforesaid, he, the said Duran, had taken proceedings in the proper tribunal for obtaining an expediente posesorio of all the land he had thus bought from the Fontanes estate, which expediente he thereafter had duly registered according to law. Complainant claims that the tracts to which Duran thus procured a possessory title include the land in controversy, while respondents, in their pleadings and through Duran and others as witnesses, claim they have no knowledge whatsoever of the tract in controversy as such, and do not know where it is, and cannot identify it, and in fact know nothing about it, save as the complainant claims it in this suit.

It is conceded by both parties to the controversy that prior to the alleged sale to Negron, as aforesaid, of the 20 cuerdas of land out of the originally supposed 200 cuerdas, there had been sold, either by the original grantee or the heirs, the following parcels: 110 cuerdas to one Figueroa or his wife; 41 cuerdas to the said Gregorio Duran; 25 cuerdas to one Montes, who afterwards transferred it to the said Duran; and it is conceded that the 57 cuerdas of surplus were also transferred to Duran after the government title was obtained thereto. This would vest in Figueroa and Duran the undisputed title to 233 of the total of 257 cuerdas and leave a balance of 24 cuerdas to be accounted for, and complainant claims that 20 cuerdas

of this are the identical land that was sold to Bernardino Negron by the heirs, as stated, and points to the fact that one of the certificates in evidence, exhibit C for complainant, shows that at the time the government surveyor, in 1891, was upon the land, he certified in his return that he cited all the adjoining owners, as was the custom, to see if they had any objection to the survey, and among these adjoining owners was this Gregorio Duran, who was present. And the said surveyor set out in his return, and in a map showing the same, the area owned by each of the then (1891) owners of the original Fontanes estate of 200 cuerdas; and, although the said Duran, when on the stand here, claimed to have bought, by a private document, all the balance of these 200 cuerdas, that is 24 cuerdas, from Francisca and Bartola Fontanes, two daughters of the original grantee and sisters of Martin Fontanes, several years' previous to the date this surveyor was there, such fact is not indicated in this surveyor's return, nor is it stated that Durán made any objection at not being designated as such owner at that time, if he was in fact the owner thereof.

Durán, when asked what he did with the private document he got for these 24 cuerdas of land, and which complainant claims is the identical land deeded to him, stated that he left this private document with all other private documents for land in that estate, at the court where he got his possessory titles. That the clerk told him they were useless thereafter. But in exhibit A for respondents, introduced in evidence, which is the grant of the government to the Martin Fontanes heirs of these 57 cuerdas of surplus, it is stated on page 5 of the translation in the copy of this surveyor's return, that Duran received 6 cuerdas from Francisca Fontanes, and mentions no purchase from Bartola. And immediately thereafter it states: "It ap-

pears, therefore, that from the title of the 200 cuerdas of land granted to Don Santiago Fontanes, 182 cuerdas have been disposed of by him and his heirs, and there remain of the said 200 cuerdas, only 18 cuerdas, of those which legally belong to them."

Complainant claims that this is a misstatement of the notary in copying from the surveyor's record, which, in fact, showed 24 cuerdas still left and made no reference to any purchase by Duran from either Francisca or Bartola Fontanes. Duran admits that, as to all these lands which he has an expediente posesorio for, he has never obtained a dominion title.

It can thus be seen that both these parties claim title deraigned from a common source, the Spanish government, through the Fontanes estate, to the land in controversy, and both claims are based upon a deed in each case that is alleged to be lost and is not produced. Complainant has fully complied with the law as to the showing necessary in such case as to the existence and loss of the instrument, so as to be entitled to introduce secondary evidence of its existence, while respondents have not fully done so and claim they are relieved from such showing by reason of the existence of their expediente posesorio.

Complainant claims that respondents had full notice of his rights, because he personally told one of them about his claim, and also because one of the respondents appraised the property under oath at the time complainant bought it; and next, because one of them confessed, according to complainant, immediately after the deed was made from Duran, that they knew about this claim, and for that reason had bought the land on time, and that it was understood between them and Duran that if complainant succeeded in showing his right to the land, respondents would make an effort to pay complainant for the land

Parés v. J. Reynes & Co.

by holding one of these deferred payments out from Duran for that purpose. Complainant further claims that respondents can have no better right than Duran, even if they had no notice at all, because they bought a mere posesorio right, and not a title.

On the other hand, respondents claim that they are innocent purchasers for value; are strangers to any claim by complainant, and attempted, as stated, to prove that Duran bought this land from Bartola and Francisca Fontanes by a private instrument, and showed that Duran thereafter obtained an expediente posesorio of the land, and that they bought it from him and paid him for it without any knowledge whatsoever of complainant's claim or rights, and that this protects them.

It appears that complainant never had any of his instruments recorded, and claims under § 20 of the mortgage law, that the deed to Negron could not have been recorded, even if complainant could have obtained it after the purchase at the execution sale, because at that time the final title, though due, had not left the government, and his grantors, therefore, had no previously recorded title. And that for the same reason, neither could the deed to complainant from the court of first instance, when he bought the land on execution, have been recorded. It is in evidence that complainant endeavored to have this latter deed recorded, but that the registrar refused for the reasons stated, and noted on the instrument itself his ground for refusal; that then the instrument was, by complainant, left with the registrar, but that, in the transition of sovereignty and change of officials, etc., it was in some manner lost, as it is alleged, and cannot be found after diligent search made. However, certified copies of the proceedings from the court, which include a complete statement of the entire attachment, appraisement by Reynes,

sale, purchase by complainant, and the making of the court deed to him and the placing of him in possession, are before us here under certificate of the clerk of that court.

Respondents introduced nothing in support of their title, other than their general denials and their deed for the 57 cuerdas of surplus to Duran, and evidence as to Duran's acquisition of the expediente posesorio for portions of the Fontanes estate, and his deed to them of the larger quantity of land, some 220 cuerdas, as aforesaid, item 4th of which, complainant claims, is the land in controversy, and save also the evidence of Duran alone that he bought land which complainant considered as this same land, from two of the sisters of Martin Fontanes several years before the deed to Negron and before the survey of the estate; but the deed to which is not produced or even mentioned in any of the surveys or transcripts before us here.

From the evidence it appears that this Bernardino Negron, to whom the land in question here is alleged to have been conveyed by the Fontanes heirs, has always been more or less subject to the control of this man Duran, even to a much greater extent than he is subject to the control of complainant. Negron testified on the stand that when he bought the land in question, Duran knew he was there in possession and saw the witness working on the same, and that he, Duran, made an effort to swap other property which he, Duran, owned, for the property in question with the witness, and that witness even agreed to the swap, but never got a deed from him to effect the change, and Duran afterwards sold the other property, and therefore witness never followed the matter further, but when he afterwards found his own land attached, as he had nothing else, he went away to Manati with Duran and has been in his employ or working under him on shares on his place ever since. The

Parés v. J. Reynes & Co.

witness further claimed that Duran knew about the attachment on the property in question, but claimed it was ineffective and for that reason wanted to get up this exchange. This evidence can be found in the record, pp. 18, 19, 23, etc. This witness further testified that at a previous term of this court he was brought here by Duran as a witness in his behalf for respondents, and that Duran and his friends kept him under such close surveillance in the hotel or house that he could hardly turn around while he was here, and that Duran made great effort to have him testify that no such deed as was made to witness by the Fontanes heirs ever was in fact made or existed, but that he, witness, could not tell such an untruth, as he well knew he had bought the land and paid for it as he has testified. The court paid particular attention to the witness while he was telling these things, and to his manner, and feels that he was honest about it. A couple of letters, complainant's exhibit D and exhibit E, were also introduced. They are letters from Duran to this man Negron, rather strongly importuning and in a manner threatening him to come forward as a witness for the defense, and showing knowledge on the part of Duran that witness was going to testify to the existence of that deed.

Several of the witnesses for the complainant, who were present when this much-discussed deed to Negron was made, testified that one Ermojenes Diaz signed it as one of the witnesses thereto, and they were positive and particular in their statements about this. This witness Diaz denied on the stand that he signed such a deed as a witness, but his answers and his manner were not at all of the positive character of those who testified to the opposite.

As to the principal witnesses, Enrique Ponsa Parés, in his own behalf, and Duran for the respondents, the court carefully

II. PORTO RICO.—27.

noted the men and their mannerisms on the stand, and can state that complainant, as stated, is a very intelligent man, speaks with positiveness of exact facts without deviation; while the other man, Duran, did not impress the court as being equally open and above board, although he, too, is evidently a shrewd man, of considerable education, and knows the effect of evidence. He appeared inclined to deny everything he was not forced to admit by overwhelming written evidence.

While it is probably generally true that the defense in any case is not called upon to bring forward evidence to aid the plaintiff, upon whom the burden rests, still, when evidence is apparently in its exclusive control to dispute the allegations made against it, and upon which some proof has been introduced, the defense could show its good faith to the court by producing it, or accounting for its loss; as, in this instance, better evidence of the making and loss of the Francisca and Bartola Fontanes deed, the transcript of the record or evidence on which the expediente posesorio is based, and the evidence of the other respondent partner in this case, whose deposition might easily have been taken, even though he is absent in Spain. It was held by the Supreme Court of the United States in Kirby v. Tallmadge, 160 U. S. 379, 40 L. ed. 463, 16 Sup. Ct. Rep. 349, that, under such circumstances, such failure might afford presumptions against the party.

The showing in this case as to the loss of all these private documents by Duran, and particularly of the one from Francisca and Bartola Fontanes, if it ever existed, is not at all satisfactory, as there are two ar three different statements about it, and it cannot be said that the deed is referred to at all in any of the exhibits, because the deed for a 6-acre tract, mentioned as having been bought by Duran from Francisca Fon-

Parés v. J. Reynes & Co.

tanes, cannot be said to be a reference to the missing deed from both women for 24 cuerdas, and may have been but a statement of Duran to the court, and not based on a deed.

Juan Reynes, one of the respondents, who is the managing partner here in Porto Rico, testified in his own behalf. The court paid particular attention to his answers and his mannerisms and it took him in hand itself several times. He appeared to be making an effort not to admit anything, save where he was confronted with irrefutable proof to the contrary. The impression he left upon the court's mind was that both he and his brother knew about complainant's claim to the land, but that, because it was not recorded, they did not believe it could have any effect, and bought notwithstanding. He made such answers as: "I have not recognized any rights (in complainant) over these lands," etc. He states that he had no knowledge of complainant's claim and that he doesn't know whether his brother had such knowledge or not; and claimed that he personally never heard of the claim until this suit was filed. Neither is his explanation of the mode in which he appraised the land in controversy at the execution sale to complainant very impressive when one reads, the elaborate ceremony of that, as set out in the recital of the court records on the subject. It is doubtful, even, if he ought now to be permitted here to deny his former solemn oath over his own signature, that he went upon the land and appraised it, and that it contained 20 cuerdas, especially as he is now in possession of the land, claiming it against the very man who bought it, as an innocent purchaser without notice, on his sworn appraisal.

Complainant claims that the absent respondent told him, shortly after the date of this deed, that when respondents purchased the larger tract of land referred to, that, it is claimed,

includes the tract in controversy, it was understood with Duran that if complainant's claim was established, one of the deferred payments would be held back to protect respondents, and complainant further testified, repeatedly and positively, that he had often talked to the absent partner about the matter, expecting and urging the firm to pay him for this land or buy it from him, and that for years he, complainant, was poor and could not afford to bring a suit, and that "it seemed to be a waiting game on the part of respondents to force him to bring a suit," which he finally had to do. It is doubtful, on all the evidence, whether respondents have yet entirely paid Duran for the land, and quite probable that they are still holding back enough of the purchase price to protect themselves.

Counsel for respondents lay great stress upon the fact that Duran's title, which they purchased, was an expediente posesorio of land that had previously belonged to the Fontanes heirs, and counsel claim that this expediente is of date prior to the purchase of the land on execution by complainant. This latter fact is technically true, because it is shown by complainant's exhibit A, p. 11, that the order of sale was issued October the 24th, 1893, while Duran's expediente, it seems, was issued to him twelve days earlier, on October 12th of that year (respondents' exhibit C, p. 4). But the attachment that was levied on this property under the supplemental proceedings was issued against it in April, some six months earlier, and was a lien on it from that time; and this, it must be remembered, was process growing out of Duran's own suit against Negron and wife for the fees and costs which Negron had failed to pay, and which Duran must have known he failed to pay, as he got three days in which to pay them at the time of the settlement with Duran. There can be no mistake about this because the

court has so certified. The return of the officer shows the levy, and gives a full description of the property. Counsel further claims that it must be presumed under the law that Negron was cited at the hearing for this expediente, and that, therefore, he is shut out and estopped. We do not admit that this view of the law is correct, but even if it is, it could not affect complainant's rights that had attached to the property so many months before. We are aware that Galindo, tomo 6, p. 264, holds that when a posesorio is about to be inscribed, the owners should be heard; but we cannot see how that affects a case like this, where the owners had transferred the title by a private document, or the owner was not in fact cited. It is manifest, also, that Negron was not, in fact, cited, because Duran had, about that time, brought him away to Manati and employed him there. And complainant denies that he had any notice of any kind or character of these expediente proceedings. Under all the evidence, it is hardly conceivable that Duran did not know of this attachment, or of Negron's title. It would seem as though complainant's right, under §§ 392, 393, and 394 of the mortgage law, would not be shut out for twenty years after the date of the expediente posesorio, if he had the better title. Lopez de Victoria v. Rodriguez, 1 Castro (P. R.) 222. Duran knew well at this time where Negron was, because he was employed by Duran, and he knew well that complainant was living near by at Morovis. And it is not to be presumed that complainant would shortly thereafter have paid about 600 pesos for a piece of land, which, had he been notified, he would have known was subject to this expediente.

The land either belongs to complainant or to the Fontanes heirs. It has never belonged to Duran or to respondents, and we think complainant has conclusively proved his title to it.

Parés v. J. Reynes & Co.

He had a right to acquire it at this execution sale. Complainant, we think, with reason, has alleged, and we also think has fully proved, that Duran intentionally failed to give him notice in this behalf, and falsely represented the facts to the court on the hearing for the expediente, and this fraud of itself would be sufficient to give this court jurisdiction, and would vitiate any rights Duran could acquire under the expediente. Not only is this true as to Duran, but one of the respondents, J. Reynes, less than a month after the date of the expediente, under oath solemnly appraised the property in question and thus helped to induce complainant to buy it and pay for it, and comes here in this trial claiming the property himself by purchase from Duran, and states that he made a mistake and thought he was appraising some other property. It is argued that it is not conceivable that Negron, if he owned this property, would go off and leave it for mere costs in a suit, but the evidence shows that at most it was then only worth 900 pesos or so, and Negron then had of the balance he received from the settlement with Duran only some 700 pesos. He may well have thought, as stated on the stand, that it was just as well to abandon the land and keep his cash, because it would have taken most of it to redeem the property. He went right off to Manati to work for Duran, and that fact may have induced Duran to rush the proceedings for an expediente, as he appears to have done.

We are well aware that under § 723 of the Rev. Stat. of the United States (U. S. Comp. Stat. 1901, p. 583), a suit in equity cannot be sustained in this court in any case where there is a plain, adequate, and complete remedy at law. But the remedy at law, in order to exclude jurisdiction in equity, must be as practical and as efficient to the ends of justice and

Parés v. J. Reynes & Co.

its prompt administration, both in respect to the final relief and the mode of obtaining it, as the remedy which equity would afford under the same circumstances. Kilbourn v. Sunderland, 130 U. S. 505, 32 L. ed. 1005, 9 Sup. Ct. Rep. 594; White v. Cannon, 6 Wall. 443, 18 L. ed. 923; Tyler v. Savage, 143 U. S. 79, 36 L. ed. 82, 12 Sup. Ct. Rep. 340; Gormley v. Clark, 134 U. S. 338, 33 L. ed. 909, 10 Sup. Ct. Rep. 554. These two latter cases are very instructive on the question of the jurisdiction here. An adequate remedy at law must be as efficient as one in equity. It must be obtainable in every court, state or Federal, having jurisdiction. Desola v. Willoughby, 1 Porto Rico Fed. Rep. 344. Attention might be called here to the case of Ely v. New Mexico & A. R. Co. 129 U. S. 291, 32 L. ed. 688, 9 Sup. Ct. Rep. 293, where it was held that in Arizona, under a statute that is word for word the same as § 282 of the local Code of Civil Procedure of Porto Rico, the complainant might bring an action for the recovery of his property, whether in or out of possession; and in Gormley v. Clark, supra, it was held that in cases where issues of fact arise, it is within the discretion of the court whether or not to send the issues at law to be determined by a jury. It is intimated that experience has shown that little care is exercised, either in description of land or citation of interested parties on hearings for expedientes posesorios, as compared with the care that is exercised when a dominion or final title is sought.

In Davis v. Wakelee, 156 U. S. 681, 39 L. ed. 579, 15 Sup. Ct. Rep. 555, it was held that where uncertainty exists under the laws of New York, as to whether a complaint in an action at law would or would not be demurrable, it must be held that the remedy at law was not so plain or clear as to oust a court of equity of jurisdiction. In the case at bar, under the local

státute, complainant would first have to go into the local court, or to the law side of this court, and set aside this expediente posesorio, and later bring another suit to set aside this deed from Duran to Reynes & Company, and then bring a proceeding against all the Fontanes heirs to supply his lost deed, and still another proceeding to force the local registrar to record or register his title as thus finally adjudicated. Valdecillo v. Duffaut, 1 Sup. Ct. P. R. 299; Lopez de Victoria v. Rodriguez, supra. Can it be denied that, under such circumstances, to avoid this uncertainty and multiplicity of suits, equity will take jurisdiction and settle the whole matter in one proceeding, as can be done in this case, especially when fraud is alleged, and an accounting requested? Smyth v. Ames, 169 U. S. 466, 42 L. ed. 819, 18 Sup. Ct. Rep. 418. We do not think so. Nor do we think that such a bill is subject to demurrer for multifariousness, but, on the contrary, under the very explicit rule laid down in Von Auw v. Chicago Toy & Fancy Goods Company, 69 Fed. 448, it is an exceedingly proper mode of straightening out the tangle brought about by respondents and those they have aided and abetted. We think the suit here serves all the purposes such other suits would serve in the local courts or on the law side of this court, and, the citizenship conferring the jurisdiction, the parties have a right to come to this forum. Smyth v. Ames, supra. We fully appreciate that it behooves us to take great care that this court is not made a means of disturbing titles, which public policy dictates should be allowed to rest; but where, as in this case, conditions between the parties have not, as we see it, in any substantial manner changed, and respondents have not shown good faith, the court ought not to hesitate about lending its aid. Neither do we think that it is material or proper for us here to decide

whether the Civil Code of 1902, as to forms of action in the local courts, superseded, in whole or in part, the actions provided for in the mortgage law, and we express no opinion as to that.

We have examined the mortgage law with considerable care, particularly the portions cited to us by counsel, and have also examined § 1841 of the Civil Code of 1902, as well as §§ 1844, 1846, 1851, 1853; 1858, 1860, and 1864, and we find nothing in the way of conflict between these different sections of the law or between them and the cases of Valdecillo v. Duffaut, and Lopez de Victoria v. Rodriguez, supra, that in any manner affects the views of the law herein expressed, or that would bring respondents within the ten-year prescriptive provision of § 1957 of the old Code, or § 1858 of the new Code, supra, and therefore we feel confident in holding that respondents, not having possessed the property in good faith and under a proper title for twenty years, as prescribed in § 1841, at the date of the filing of this suit, do not come within the terms of the ten-year period of prescription mentioned in § 1858.

We have examined again with care the case of Frost v. Spitley, 121 U. S. 552, 30 L. ed. 1010, 7 Sup. Ct. Rep. 1129, with which we have been familiar for several years, and which is now cited with great confidence by counsel for respondents, and we can see nothing in it ousting the court of jurisdiction. That was a case under a peculiar statute in Nebraska. An examination of the case will show, we think, that it turns on two points; that is, that the complainant was not in possession, and had the equitable title only. In this case, as we view it, under all the circumstances, we do not think respondents, or their predecessor in interest, Duran, have, or ever had, any title at all, legal or equitable, to the property in question. The title,

at the time of the application for the expediente, was apparently .in the Fontanes heirs, but in fact was in Bernardino Negron, of which Duran and respondents knew, and shortly thereafter it vested in complainant, also to the knowledge of Duran and respondents, and complainant still holds it.

For the reasons given, we feel and hold that the court has complete jurisdiction in the premises, that the demurrer was properly overruled by the previous incumbent of this bench, and that the statute of limitations has not availed respondents.

And so having heard the evidence, seen the witnesses, examined the record and exhibits, and carefully reread the transcript of all the oral testimony, we feel constrained to, and do, make the following

## Findings of Fact and Law.

That complainant has proved every material allegation of his bill.

That he is the owner of the 20 cuerdas of land in question.

That the witness Duran, in 1892, had complete knowledge of complainant's rights in the premises, and falsely represented the facts as to the ownership of the land and suppressed the same before the tribunal which issued to him his expediente posesorio for the same, and that respondents can have no greater rights than he has, but are bound by his doings in that regard.

That the respondents, at the time they purchased the land in controversy from the said Duran, and for more than three years prior thereto, had full and complete knowledge of complainant's rights in the premises, and are in no sense innocent purchasers for value without notice.

That the possessory title recorded in favor of Duran with

reference to this land is a cloud upon complainant's title thereto, and should be removed, and that his deed to the respondents, in so far as it affects the land in controversy, is also a cloud upon complainant's title, which, in like manner, should be removed, and that said land is:

A rustic finca situated in the barrio of Fronton, municipality of Ciales, in Porto Rico, said tract consisting of 20 cuerdas of land, described as follows:

"Being bounded on the north and west by the lands of the sucesión of Martin Fontanes; on the south by lands of Antonio Figueroa and Gregorio Duran, and on the east by lands of the said Duran, as such boundaries existed in the year 1892; and which land in said year had its boundaries marked by trees and stones, particularly tabonuco trees, on which crosses were made with machete, and a large stone put in at another place, and had another of its corners marked with a jobo tree which was then planted, and another boundary of which was a road leading to the Mameyes barrio of the jurisdiction of Utuado, and which said 20 cuerdas of land are mentioned in item 4th in the deed from Gregorio Duran y Baez to La Sociedad 'J. Reynes y Compañia,' made on the 8th day of May, 1897, before Notary Francisco I. Nater y Rivera, under No. 228, and which is recorded at folios 134 and 141 of vol. 20 of Ciales properties, Nos. 1152 and 1153, registration first, under date of July 12, 1897; and being a portion of the same property with reference to which the said Gregorio Duran y Baez had approved and issued to him an expediente posesorio by the municipal court of Ciales, by a writ dated October 12, 1893, which is recorded at folio 199 of vol. 15 of Ciales properties, No. 803, registration first. Reference to all of which is hereby had for a better description."

That the proper registrar should be required to cancel any and all entries in his registry thus clouding or affecting complainant's title to the 20 cuerdas of land thus described, and make all needful entries fully to vest complainant with the title thereto, as against all Fontanes heirs, Bernardino Negron, Gregorio Duran y Baez, and the respondent, J. Reynes y Compañia.

That under Spanish law, as in force in Porto Rico, an expediente posesorio, before the time has elapsed to entitle its possessor to a dominion title, has no final effect as to a better title, either in favor of the person to whom it is issued or his assigns, and is simply notice to the world that the person in whose favor it is issued is holding adverse possession of the premises described, and certainly has no effect against those who, as in this case, conclusively show that they were not in fact cited to appear at the hearing, and had no notice of the issuance of such expediente.

That respondents, neither by themselves nor their predecessor Duran, have been in possession of said premises for the time or in the manner prescribed by law, so as to give them good prescriptive title thereto as against complainant.

That there is not sufficient proof in this case to enable the court to render any accounting between the parties, and that complainant has been guilty of laches in that regard, and for such reason an accounting should be denied, and only costs of suit be allowed.

Therefore a proper decree in the premises will be prepared and entered herein, and all necessary and proper orders and commands to registrars and others will issue in accordance herewith, and it is so ordered.